Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| YARITZA M. CLAUDIO MESTRE<br><br>Apelada<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO Y OTROS<br><br>Apelante | TA2025AP00445 | *Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan*<br><br>Sobre: DAÑOS Y PERJUICIOS<br><br>Caso núm.: SJ2023CV03305 |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Mateu Meléndez, la Jueza Boria Vizcarrondo y el Juez Robles Adorno.

Robles Adorno, Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de enero de 2026.

El 14 de octubre de 2025, el Gobierno de Puerto Rico (el Estado o la parte apelante) presentó un *Escrito de Apelación* en el que solicitó que revoquemos la *Sentencia Final* emitida el 14 de julio de 2025, notificada el 15 de julio de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario).[1]

En el aludido dictamen, el TPI declaró Ha Lugar la *Demanda* radicada por la señora Yaritza M. Claudio Mestre (la señora Claudio Mestre o la apelada) en la que condenó al Estado que pagara la suma de $50,000.000 en concepto de daños y perjuicios a consecuencia de sufrir una caída en una acera en el Municipio de San Juan. Asimismo, el foro primario determinó que, procedía imponerle un cincuenta (50) por ciento de responsabilidad a la señora Claudio Mestre tras aplicar la defensa de negligencia comparada.

---

[1] Entrada Núm. 94 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

Número Identificador
SEN2025_____

Evaluada la prueba oral y la totalidad del expediente ante nos, por los fundamentos que expondremos a continuación, se confirma la *Sentencia* apelada.

**I.**

El caso de epígrafe tuvo su origen cuando el 19 de abril de 2023, la señora Claudio Mestre instó una *Demanda* en la que alegó que sufrió una caída el 21 de diciembre de 2022 a eso de las 11:40 p.m. en el carril color verde conocido como "ciclovía", frente al Capitolio en dirección hacia Viejo San Juan.[2] Arguyó que, dicha caída se debió a que la apelada transitaba en una *scooter* junto con un grupo de amistades y esta tropezó con "un tubo que se encontraba doblado agarrado de su base, ocupando en el suelo parte del referido carril. Ante ello, la señora Claudio Mestre argumentó que, perdió el control de un *scooter* y cayó en el pavimento. Adujo que, sufrió un trauma en la cabeza y en su oído izquierdo, lo que provocó que perdiera audición en ese lado. Consecuentemente, señaló que, el Departamento de Transportación y Obras Públicas (DTOP) y el Municipio de San Juan (el Municipio) no mantuvo en condiciones aptas la acera y, tampoco había un aviso que advirtiera sobre la condición de peligrosidad de la acera. Por tanto, el Estado debía responder por los daños sufridos.

Tras varios incidentes procesales, el 21 de julio de 2023, el Estado radicó una *Contestación a la demanda*, en la que negó en su mayoría, las alegaciones de la apelada.[3] Alegó que, la vía estaba en condiciones adecuadas para transitar. Asimismo, la señora Claudio Mestre fue responsable de su propia caída.

El 26 de julio de 2023, el Municipio y su aseguradora MAPFRE, presentaron una *Contestación a demanda* en la que,

---

[2] Entrada Núm. 1 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

[3] Entrada Núm. 16 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

negaron la mayoría de las alegaciones de la apelada.[4] El Municipio indicó que, ha cumplido en mantener en condiciones seguras sus aceras. Empero, sostuvo que, desconocía si en dónde ocurrió el accidente estaba sujeto a su jurisdicción. Por otro lado, señaló que, de haber ocurrido el accidente en una acera sujeta a la jurisdicción del Municipio, este no debía responder dado que el accidente ocurrió a consecuencia de la apelada ser negligente conduciendo el *scooter*. Por ende, solicitó que el TPI declarara No Ha lugar la *Demanda* instada por esta.

Así las cosas, el 17 de octubre de 2023, el Municipio instó una *Moción de sentencia sumaria parcial* en la que alegó que el carril exclusivo para bicicletas, en dónde que ocurrió el accidente de la apelada, no estaba bajo la jurisdicción del Municipio.[5] Consecuentemente, solicitó que el foro primario desestimara la causa de acción radicada en contra del Municipio ante la ausencia de un nexo causal con respecto a este y la caída que sufrió la apelada.

En respuesta, el 30 de noviembre de 2023, la señora Claudio Mestre presentó una *Oposición a solicitud de sentencia sumaria parcial* en la que destacó que, existía controversia con relación al carril en cuestión, dado que estaba cobijado bajo la jurisdicción del Municipio.[6] Sostuvo que, el Municipio tenía como política pública el fomentar el uso de bicicletas y, por tanto, el Municipio ha sido el encargado de mantener los carriles de bicicletas. Consecuentemente, planteó que no procedía la desestimación de la causa de acción debido a que había evidencia que demostraba que

---

[4] Entrada Núm. 17 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).
[5] Entrada Núm. 35 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).
[6] Entrada Núm. 41 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

el Municipio llevaba a cabo actos de mantenimiento en favor de los "ciclovías".

El 7 de diciembre de 2023, notificada el 8 de diciembre de 2023, el TPI emitió una *Sentencia Parcial* en la que declaró Ha Lugar la *Moción de sentencia sumaria parcial* tras determinar que el lugar del accidente era una carretera estatal y la jurisdicción y control no le corresponde al Municipio.[7]

Tras un extenso descubrimiento de prueba, el 18 de noviembre de 2024, las partes sometieron ante el foro primario el *Informe preliminar entre abogados y abogadas*[8] en la que estipularon los hechos, documentos y asuntos sobre los cuales no existía controversia:

> 1. Las circunstancias personales de la demandante, Sra. Yaritza M. Claudio Mestre.
> 2. La testigo Lisamar Rivas Santiago es mayor de edad.
> 3. Para el 21 de diciembre de 2022, la Sra. Yaritza M. Claudio Mestre y la Sra. Lisamar Rivas Santiago residían juntas en Toa Baja.
> 4. El vehículo que usaba la parte demandante al momento del alegado accidente es una scooter eléctrica, propiedad y mantenida por la compañía privada SKOOTEL LLC., la cual utilizaba mediante alquiler temporero.
> 5. La carretera donde se alega ocurrió el incidente objeto de la Demanda está dentro de la jurisdicción, control y mantenimiento del DTOP.
> 6. El ELA/DTOP puede estipular la autenticidad del informe de incidente de la Policía, anunciado por la parte demandante, sin embargo, no así su contenido por tratarse de prueba de referencia.

De igual forma, las partes anunciaron los testimonios y la prueba documental que presentarían durante el juicio. Asimismo, informaron sobre que personas serían testigos en el caso.

Así pues, el 14 de julio de 2025, notificada el 15 de julio de 2025, el foro primario emitió una *Sentencia*[9] en la que fue admitida la siguiente prueba oral:

---

[7] Entrada Núm. 43 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

[8] Entrada Núm. 69 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

[9] Entrada Núm. 94 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

A. Parte demandante, (Minuta del juicio, Sumac 81):
Exhibit 1-A: Foto de lugar del accidente (Sumac 73, anejo 6)
 Exhibit 1-B: Foto de lugar del accidente (Sumac 73, anejo 5)
Exhibit 1-C: Foto de demandante (Sumac 73, anejo 3)
Exhibit 2: Informe de Incidente preparado por la Policía Municipal de San Juan núm. 2022-1-166-055-4185 por el Agte. Bernard Orta, placa número 2274. (Sumac 73, anejo 7).
Exhibit 3: Curriculum Vitae del Dr. Charles Juarbe. (Sumac 73, anejo 1).
 Exhibit 4: Informe pericial del Dr. Charles Juarbe. (Sumac 73, anejo 2).

B. Parte Demandada, Véase Minuta de continuación de juicio, (Sumac 82):
• Exhibit 1: Dibujo demostrativo realizado por la Sra. Lisamar Rivas el 2 de abril de 2025.

A esos fines, evaluada la prueba, el TPI formuló las siguientes determinaciones de hechos:

1. La demandante, Yaritza Marie Claudio Mestre, tiene 45 años, reside en Toa Baja, PR, estudió un grado de paramédico en lo cual trabajó por 15 años y actualmente está incapacitada por el seguro social. La determinación de incapacidad del seguro social no se relaciona a los hechos de este caso.

2. Para el 21 de diciembre de 2022, la Sra. Yaritza M. Claudio Mestre y la Sra. Lisamar Rivas Santiago residían juntas en Toa Baja.

3. El vehículo que usaba la parte demandante al momento del alegado accidente es un scooter eléctrico, propiedad y mantenida por la compañía privada SKOOTEL LLC., la cual utilizaba mediante alquiler temporero.

4. La carretera donde se alega ocurrió el incidente objeto de la Demanda está dentro de la jurisdicción, control y mantenimiento del DTOP.

5. Lisamar Ríos Santiago tiene 32 años de años y es pareja de la demandante. Trabaja como representante de servicio de Universal Ins. Company y tiene preparación académica de enfermería, grado asociado.

6. Ríos Santiago estuvo presente el 21 de diciembre de 2022 cuando la demandante sufrió la caída. Ese día salieron de su residencia en Toa Baja para compartir con unas amistades. Visitaron el Viejo San Juan y decidieron alquilar unas scooters o patinetas motorizadas para dar una vuelta. A la demandante y a Ríos Santiago, les acompañaban tres amigas más de nombres Maricarmen, Tania y Brenda. Procedieron a alquilar las scooters mediante una aplicación digital y se dirigieron hacia Condado por la parte sur del Viejo San Juan. De regreso, se dirigieron por el área de la playa El Escambrón (parte norte) y bajaron por el área destinada, llamada el ciclo vía, lo que se describió como el carril verde para bicicletas y scooters.

7. Ríos Santiago alquiló su scooter y realizó la transacción de la demandante. Admitió que aceptó los términos y condiciones para poderla usar.

8. Una vez en Condado, decidieron regresar al área del Viejo San Juan. Para ello tomaron la ruta del ciclo vía en el área norte. Indicó que se dirigían de dos en dos, ya que la ciclo vía era ancha. Describió que la demandante iba frente a ella con Tania, detrás de éstas iba Ríos Santiago y Maricarmen y por último Brenda4.

9. Cuando estaban frente al Capitolio, Ríos Santiago, que iba detrás de la demandante, observó un tubo en el suelo sobre la ciclo vía. La demandante no vió el tubo y al impactarlo con el scooter, perdió el control y cayó con la cabeza hacia la playa y los pies hacia el Capitolio. Ríos Santiago identificó el Exhibit 1 (b) como el lugar del accidente donde se observa la línea blanca que divide el carril de los automóviles y la ciclo vía. Indicó que el tubo estaba sobre el carril verde y no estaba desprendido de su base. (Sumac 73).

10. La caída ocurrió aproximadamente a las 11:40 de la noche. Tan pronto ocurrió la caída, Ríos Santiago le auxilió, indicó que esta no respondía y tenía sangre en la cabeza y oído. La demandante fue transportada en ambulancia, luego de que llamaran al 911, y se dirigieron a Centro Médico. La Policía de Puerto Rico también se personó al lugar y rindió un informe querella número 2022-1-166-4185. (Exhibit 2, Sumac 73).

11. Ríos Santiago identificó el Exhibit 1c como una foto tomada por ésta que refleja a la demandante en la camilla y muestra la sangre en el oído. (Sumac 73). Aclaró que cuando llegaron los paramédicos la demandante estaba alerta, pero no estaba coherente.

12. Ríos Santiago acompañó a la demandante en la ambulancia hacia Centro Médico, al cual llegaron, aproximadamente en 5 minutos. A la demandante le hicieron un CT de cabeza y otros estudios. La demandante sangró por el oído izquierdo y la cabeza. Estuvo dos días en Centro Médico acompañada por Ríos Santiago. Según el testimonio de Ríos Santiago, la demandante estaba desorientada, no recordaba lo ocurrido, al día siguiente es que preguntó que ocurrió y se le informó. Después del alta, la demandante se instaló en casa de su madre para ser atendida, donde estuvo por dos meses. Durante ese tiempo, Ríos Santiago la cuidaba por las noches y la madre de la demandante por el día.

13. La demandante no había utilizado un scooter antes. La demandante y ninguna de sus acompañantes utilizó casco protector.

14. La demandante testificó que no recuerda como sucedió el accidente. Solo se recordó que estaba tirada en el suelo "con la mente oscura" y no recuerda nada más. Cuando despertó tenía vértigo, mareos y náuseas. Experimentó mucho dolor de cabeza que describió con una "presión bien grande" y dolor en el oído izquierdo. No recuerda nada de la atención en el hospital, ni el tiempo que estuvo allí.

15. Cuando le dieron de alta, se dirigió a casa de su madre donde estuvo por dos meses. Con relación a los daños, expuso que al principio no podía caminar que era como empezar a caminar nuevamente como un

bebé. Indicó que debido al accidente tiene daño en su oído izquierdo con pérdida de audición. Debido al vértigo que sufre, no quiere estar sola. Describió la sensación de vértigo como "una machina, bien rápido". La demandante tuvo que asistir a varias citas médicas, aunque no recuerda cuántas y con un otorrinolaringólogo. Indicó que el dolor de cabeza es bien fuerte, del 1-10 en nivel de intensidad, lo describió como 20.

16. La demandante está incapacitada por el seguro social por post traumatic stress disorder (PTSD), previo a los hechos de esta demanda en el 2017.

17. En cuanto a su estado emocional, declaró que se siente mal porque siente que ha ido hacia atrás luego de su condición previa. 18. En el contrainterrogatorio la demandante indicó que Ríos Santiago iba frente a ella cuando ocurrió el accidente, en contradicción a lo indicado por Ríos Santiago. Indicó que ese es su recuerdo.

19. La parte demandante presentó como perito al doctor Charles Juarbe Santos, especialista en otorrinolaringología y cirugía de cabeza y cuello. El Dr. Juarbe Santos tiene experiencia como especialista por 38 años y su número de licencia es 5777. En su carrera profesional ha sido reconocido en varias ocasiones y ha publicado más de una veintena de trabajos académicos. Ha fungido como perito en el tribunal previamente. Véase Exhibit 3, curriculum vitae. (Sumac 73).

20. El Dr. Juarbe Santos examinó a la demandante el 28 de septiembre de 2023 en una visita inicial y luego en una segunda visita el 13 de noviembre de 2023. La demandante le refirió su queja principal con dolores de cabeza intensos, mareos y pérdida de audición. El perito evaluó documentos judiciales, radiografías, pruebas audiológicas, expedientes médicos, entre otros, y le ordenó repetir la prueba audiológica. De los expedientes médicos que examinó surge que la demandante tuvo una fractura mixta longitudinal del hueso temporal, eso es el hueso del cráneo donde está el órgano auditivo y el balance. El perito describió que eso es como el procesador del sonido. De los expedientes médicos también se desprende que, a raíz de la caída, la demandante tuvo aire en el cerebro, sangre en el oído izquierdo, laceración de la membrana del tímpano. A la fecha de la evaluación del perito, ya esto había cicatrizado. Sin embargo, la demandante continúa con molestia ante sonidos altos y vértigos posicionales.

21. El perito rindió un informe pericial en el que concluyó que a causa del accidente la demandante tuvo pérdida auditiva y sensorial, trauma palietal lateral, mareos, vértigo, sensibilidad a ruidos altos y daño permanente al nervio auditivo.

22. El ingeniero Waldeltrudis Cruz Torres trabajó para el Departamento de Transportación y Obras Públicas por aproximadamente 25 años. Se acogió al retiro el 31 de marzo de 2025. Cruz Torres tiene un bachillerato en química de la Universidad de Puerto Rico, Río Piedras y un grado en ingeniería mecánica de la Universidad Politécnica, Puerto Rico. Su licencia de ingeniero es 16239. En el DTOP trabajó como ingeniero y Director

Regional por 12 años hasta su retiro. Previo a ello, fue Director Regional en Humacao.

23. A los efectos del caso de marras testificó que reconoce el lugar del accidente como la ciclo vía que discurre desde el Condado hasta el Capitolio y el Viejo San Juan. Se le mostró el Exhibit (1) (a) de la parte demandante y reconoció el ciclo vía. Identificó que en el piso entre la línea blanca del carril y la ciclo vía hay unos delineadores y marcadores reflectivos. Expuso que los delineadores son como unos tubos plásticos, un elemento flexible, instalado de manera vertical que canalizan el tránsito. Con relación al Exhibit mostrado, admitió que están en el piso. Añadió que los tubos o delineadores tienen una base la cual puede notarse agarrada a la superficie de la carretera. (Sumac 73).

24. Al mostrársele el Exhibit 1 (b) indicó que reconoce el lugar frente al Capitolio en la parte norte de la carretera. Identificó un delineador con su base en forma vertical. De la foto admitió la mayoría del carril de ciclo vía no tiene delineadores. Explicó que los delineadores se utilizan para dividir los carriles y canalizar el tránsito. Añadió que el que no existan delineadores puede deberse a impacto, por lo cual se reemplazan lo que es previsible para el DTOP.

25. Cruz Torres indicó que no existe bitácora ni protocolo alguno para el mantenimiento del ciclo vía. Admitió que el DTOP debía saber las condiciones de ese ciclo vía. Añadió que, si se impacta el delineador o si se dobla, éste vuelve a su estado original, es decir a levantarse de forma vertical. Sin embargo, la fotografía muestra el delineador -aunque agarrado de su base- está en posición horizontal en el ciclo vía. A esto, el testigo respondió que debido a los impactos puede que se dañe el mecanismo.

26. En el contrainterrogatorio, el testigo demostró con un objeto similar a los delineadores en controversia, que éstos al estar su base agarrada o atornillada a la superficie de la carretera y ser flexibles, su mecanismo provoca que ante un impacto vuelvan a su forma vertical ya que tienen un rango de movimiento de 180 grados. Según su conocimiento, éstos se pueden mover en cualquier dirección, pero no pueden rotar.

27. En particular, en relación con el caso de marras indicó que los delineadores tienen un pasador de acero en su base que restringe el movimiento, por tanto, el tubo no puede girar. Según su apreciación, el delineador solo puede caer hacia el este u oeste, no como en la foto el cual se muestra hacia el norte.

28. Los delineadores están hechos de un material llamado HDP, "high density polietilin".

El foro primario determinó que quedó evidenciado que la señora Claudio Mestre sufrió una acumulación de sangre, una factura craneal y aire en el pneumo encéfalo. El *foro a quo* entendió que la apelada apenas podía caminar y continuaba sufriendo efectos secundarios a causa de la caída. Además, la señora Claudia Mestre

quedó sorda de un lado. En esa línea, el foro primario señaló que los daños sufridos por la apelada son "mayores". Empero, el TPI determinó que, un testigo, que iba detrás de la apelada el día de los hechos, observó el delineador en el suelo, por lo que estaba visible y, por tanto, la señora Claudio Mestre no ejerció el debido cuidado de ver por dónde transitaba. Además, el foro primario razonó que la señora Claudio Mestre no utilizó un casco protector, el cual hubiese minimizado los daños. En virtud de lo anterior, el *foro a quo* determinó que la apelada fue responsable en una proporción de un cincuenta (50) por ciento, por lo que ordenó que el Estado indemnizara a la señora Claudio Mestre por la cuantía de $50,000.00 en concepto de daños y perjuicios. Es menester señalar que, el TPI fundamentó su cuantía en casos relacionados sobre valorización de daños.

Insatisfecho, el 30 de julio de 2025, el Estado radicó una *Moción de determinaciones de hechos y conclusiones de derecho adicionales y de reconsideración*[10] en la que solicitó que se formulara los siguientes hechos adicionales:

1. La señora Lisamar Rivas Santiago admitió que, aun cuando ella vio el tubo en el suelo perpendicular en la ciclovía, no alertó a sus compañeras de éste.
2. La señora Lisamar Rivas Santiago afirmó que el tubo, que vio en el suelo perpendicular a la ciclovía, giró de manera tal que quedó paralelo a la ciclovía exactamente sobre la línea divisoria del carril, luego de que fuera impactado por la señora Yaritza M. Claudio Mestre.
3. El orden en que transitaban el grupo de amigas fue cambiado por la señora Lisamar Rivas Santiago en su testimonio durante el juicio, indicando que se equivocó cuando brindó su testimonio el 23 de febrero de 2024, en fecha más cercana a los eventos.
4. Fue el testimonio de la señora Yaritza M. Claudio Mestre y de la señora Lisamar Rivas Santiago que no consideraron necesario ni prudente hacer uso de un casco protector al utilizar la patineta eléctrica o scooter.
5. La señora Yaritza M. Claudio Mestre indicó que la patineta eléctrica o scooter corría a una velocidad aproximada de unas 10 millas.
6. El ingeniero Woldetrudis Cruz Torres testificó que los delineadores ("tubos") se utilizan para canalizar el tránsito.

---

[10] Entrada Núm. 97 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

7. El ingeniero Woldetrudis Cruz Torres indicó que el propósito del delineador es que se doble por algún impacto y vuelva a su posición original, por lo que "puede ocurrir un sinnúmero de veces hasta que éste puede fallar".

8. El ingeniero Woldetrudis Cruz Torres aceptó que no surge de la foto que los delineadores hayan sido reemplazados1.

9. El ingeniero Woldetrudis Cruz Torres indicó que para canalizar el tránsito existen también los marcadores auto-reflectores, y la línea divisoria de los carriles.

10. El ingeniero Woldetrudis Cruz Torres indicó que, aunque no haya algunos delineadores, uno solo es suficiente para canalizar el tránsito.

11. Incluso el delineador tiene un reflector, y fue el testimonio del ingeniero Woldetrudis Cruz Torres que habían delineadores y auto-reflectores en el suelo sobre la línea divisoria de los carriles.

12. El ingeniero Woldetrudis Cruz Torres explicó que los delineadores son instalados en posición vertical, su base de goma tiene varios huecos (3 huecos) para fijarlos al pavimento con unas expansiones y tornillos, y sobre esa base se coloca el "tubo" de manera vertical en una pieza tipo cilindro en el centro de la base. En esa pieza cilíndrica de la base hay otros huecos que atraviesan de manera horizontal, el tubo del delineador se coloca alineado a esos "huecos" y se coloca un pasador que evita que el tubo del delineador pueda girar.

14. El ingeniero Woldetrudis Cruz Torres detalló que el pasador se instala en dirección perpendicular a la vía.

15. El ingeniero Woldetrudis Cruz Torres indicó que el delineador está instalado para que doble en la misma dirección del tránsito, pero no puede rotar en su base.

16. El ingeniero Woldetrudis Cruz Torres enfatizó que los delineadores tienen un solo grado de libertad de movimiento.

17. El ingeniero Woldetrudis Cruz Torres, en relación con la fotografía identificada como Exhibit 1-A, expresó que el delineador está anclado a su base.

18. El ingeniero Woldetrudis Cruz Torres testificó que si el delineador estaba acostado perpendicular a la ciclovía no era posible que pudiera girar circunferencialmente.

19. Del testimonio del ingeniero Woldetrudis Cruz Torres surge que el delineador nunca pudo estar colocado de manera perpendicular a la ciclovía como alega la demandante, pues el mismo partiría y no estaría anclado en su base.

20. El ingeniero Woldetrudis Cruz Torres testificó que el DTOP no podría reemplazar un delineador a menos que le sea informado.

21. El ingeniero Woldetrudis Cruz Torres explicó que el pasador es de acero inoxidable por lo que no es posible que rompa con un impacto.

El Estado alegó que la falta de protocolos o rondas preventivas no establece por sí sola que el DTOP debió conocer la condición de peligrosidad de la vía. Adujo que, el delineador no podía estar en

posición vertical el día de los hechos debido a que estaba anclado a su base. Arguyó que, no se presentó evidencia que constara que la parte apelante tuviera conocimiento de la condición de peligrosidad que tenía la acera. Además, argumentó que se le debía imponer una proporción mayor de negligencia a la apelada ante su grave descuido tras transitar de noche y sin protección alguna. Por tanto, solicitó que el TPI declarase Con Lugar la referida moción y acogiera las determinaciones de hechos formuladas por este.

En atención a ello, el 11 de agosto de 2025, la señora Claudio Mestre instó una *Oposición a moción de determinaciones de hecho y conclusiones de derecho y de reconsideración* en la que alegó que la parte apelante no controvirtió las determinaciones de hechos formuladas por el *foro a quo*.[11] Subsiguiente, afirmó que los hechos formulados por la parte apelante fueron considerados en la *Sentencia* emitida por el TPI. Por otro lado, planteó que quedó demostrado en el juicio que, la parte apelante no brindó el mantenimiento requerido a la ciclovía ni a los delineadores flexibles. Con ello, sostuvo que, no procedía la reconsideración instada por el Estado.

Evaluado ambas posturas, el 12 de agosto de 2025, el foro primario emitió y notificó una *Resolución Interlocutoria* en la que declaró No Ha Lugar la *Moción de determinaciones de hechos y conclusiones de derecho adicionales y de reconsideración*.[12]

Inconforme, el 14 de octubre de 2025, el Estado presentó ante nos una *Apelación* en la que coligó los siguientes señalamientos de error:

> Primer error: Erró el Tribunal de Primera Instancia al concluir que el Estado es responsable de los daños sufridos por la Sra. Yaritza M. Claudio Mestre al amparo del Artículo 404 del Código Político, 3 LPRA sec. 422.

---

[11] Entrada Núm. 99 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

[12] Entrada Núm. 100 del caso núm. SJ2023CV03305 en el Sistema Unificado para el Manejo y Administración de Casos (SUMAC).

Segundo error: Erró el Tribunal de Primera Instancia al imponer únicamente cincuenta por ciento de negligencia comparada cuando de la prueba surge que procedía la imposición de un número mayor.

En atención a nuestra *Resolución,* el 24 de octubre de 2025, la parte apelante radicó una *Moción para someter la transcripción de la prueba oral* en la que anejó la transcripción de las vistas del juicio en su fondo.

Así las cosas, en cumplimiento de nuestra *Resolución,* el 6 de enero de 2026, la apelada radicó un *Alegato en oposición a la apelación.*

Con el beneficio de la comparecencia de las partes y la prueba oral, procederemos a resolver el recurso ante nuestra consideración.

**II.**

**A.**

Una de las fuentes de las obligaciones surge cuando los actos y las omisiones en los que intervenga cualquier género de culpa o negligencia, está obligado a reparar el daño causado. Código Civil de Puerto Rico, 31 LPRA sec. 5141. El Art. 1536 del Código Civil de Puerto Rico, *supra* sec. 10801, establece que la persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo. La culpa o negligencia consiste en "la falta de debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". *López v. Porrata Doria,* 169 DPR 135, 151 (2006); *Toro Aponte v. ELA,* 142 DPR 464, 473 (1997). Para que prospere una acción de daños y perjuicios, el reclamante debe establecer: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que ser culposo o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.,* 210 DPR 465 (2022); *Pérez Hernández v. Lares Medical Center, Inc.,* 207 DPR 965, 976 (2021);

*López v. Porrata Doria, supra*, pág. 150 (2006). La culpa o negligencia consiste en la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Mena Pamias v. Jiménez Meléndez*, 212 DPR 758, 768 (2023). Véase, además, *Pérez Hernández v. Lares Medical Center, Inc., supra*, págs. 976–977; *López v. Porrata Doria, supra*, pág. 151; *Toro Aponte v. ELA*, 142 DPR 464, 473 (1997).

Ahora bien, entre el acto culposo y el daño sufrido debe existir un nexo causal adecuado. *Pérez Hernández v. Lares Medical Center, Inc., supra*, pág. 977. El nexo causal adecuado no es "causa de toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce, según la experiencia general". *Pérez Hernández v. Lares Medical Center, Inc., supra*, págs. 976-977.

Así pues, una vez se imponga responsabilidad conforme a la normativa jurídica pormenorizada, se resarce al damnificado con un valor económico al daño sufrido. *Mena Pamias v. Jiménez Meléndez, supra*, pág. 769; citando a: *García Pagán v. Shiley Caribbean, etc.*, 122 DPR 193, 206 (1988). En lo pertinente, la defensa de negligencia comparada estatuye que, al perjudicado no se le exime de responsabilidad, pero conlleva la reducción de la indemnización. *Semidey Ramos v. Farmacia Belmonte*, 211 DPR 222, 235 (2023). La negligencia comparada tiene como efecto atenuar la responsabilidad de la parte demandada, teniendo ante su consideración "el grado de negligencia desplegado por la parte demandante que contribuye a la producción de sus propios daños". *Semidey Ramos v. Farmacia Belmonte, supra*, págs. 235-236, citando a: *Colón Santos v. Coop. Seg. M [ú]lt. P.R.*, 173 DPR 170, 178 (2008). Ante la negligencia comparada, "el tribunal está llamado a 'individualizar las indemnizaciones por daños, colocando el rigor económico en las

partes conforme a la proporción de su descuido o negligencia". *Semidey Ramos v. Farmacia Belmonte, supra*, pág. 236.

Ahora bien, en atención a la controversia ante nos, el Art. 403 del Código Político de Puerto Rico, 3 LPRA sec. 421, establece que el Secretario del Departamento de Transportación y Obras Públicas tiene la responsabilidad de mantener las carreteras a su cargo en buen estado de conservación. En esa línea, en una acción de daños y perjuicios, le corresponde al Estado Libre Asociado de Puerto Rico, indemnizar y responder a los perjudicados por los daños y perjuicios ocasionados debido a los desperfectos y la falta de reparación o protección en las vías a cargo de DTOP, salvo que los desperfectos fueron causados por la violencia de elementos y no hubo tiempo para remediarlos. Art.404 del Código Político de Puerto Rico, *supra* sec. 422. La *Ley de Travesías*, Ley Núm. 49 de 1 de diciembre de 1917 (Ley Núm. 49-1917), según enmendada, 9 LPRA sec. 12, estatuye que, las carreteras que atraviesen zonas urbanas de los pueblos. El Art. 2 de la Ley Núm. 49-1917 dispone que las vías que atraviesan las zonas urbanas "serán consideradas como parte de las carreteras estaduales y sometidas a las disposiciones vigentes en la ley para la conservación y policía de los caminos públicos del Estado Libre Asociado de Puerto Rico". Los municipios tienen la obligación de mantener las aceras en un estado de uso razonable. *González Meléndez v. Municipio Autónomo de San Juan*, 212 DPR 601, 613 (2023); citando a: *Oliver v. Municipio de Bayamón*, 89 DPR 442, 445 (1963). Un municipio no se puede liberar de responsabilidad cuando alega que la situación de peligrosidad que había en la acera no estaba bajo su control, teniendo en cuenta el riesgo que podía anticiparse. *González Meléndez v. Municipio Autónomo de San Juan, supra*, pág. 613.

No obstante, aunque un tercero adopte tener el dominio y control de una acera no exonera al municipio de responsabilidad.

*González Meléndez v. Municipio Autónomo de San Juan, supra,* págs. 613-614; citando a: *Del Toro v. Gob. de la Capital,* 93 DPR 481, 484–485 (1966). A modo de excepción, el Art. 1.053 del Código Municipal de Puerto Rico, Ley Núm. 107 de 13 de agosto de 2020 (Ley Núm. 107-2020), según enmendada, 21 LPRA sec. 7084, dictamina que,

> No estarán autorizadas las acciones contra el municipio por daños y perjuicios a la persona o la propiedad por acto u omisión de un funcionario, agente o empleado de cualquier municipio:
>
> (a) En el cumplimiento de una ley, reglamento u ordenanza, aun cuando éstos resultaren ser nulos.
>
> (b) En el desempeño de una función de carácter discrecional, aun cuando hubiere abuso de discreción.
>
> (c) En la imposición o cobro de contribuciones.
>
> (d) Constitutivo de acometimiento, agresión u otro delito contra la persona, persecución maliciosa, calumnia, libelo, difamación y falsa representación e impostura.
>
> (e) Ocurrida fuera de la jurisdicción territorial de Puerto Rico.
>
> (f) En el desempeño de operaciones de combate por las fuerzas navales o militares en caso de guerra, invasión, rebelión u otra emergencia debidamente declarada como tal por las autoridades pertinentes.
>
> (g) Cuando ocurran accidentes en las carreteras o aceras estatales.

En *González Meléndez v. Municipio Autónomo de San Juan, supra,* pág. 616, el Tribunal Supremo interpretó el citado artículo en el que determinó que, el legislador prohibió la presentación de las reclamaciones en daños y perjuicios contra los municipios cuando estén presente cualquiera de los incisos previamente contemplados.

## B.

Nuestro más alto foro ha expresado que el TPI está en mejor posición que los tribunales apelativos para evaluar la estimación y valorización de daños, pues son los que tienen contacto directo con la prueba. *Blás v. Hosp. Guadalupe,* 146 DPR 267, 339 (1998). De igual modo, este ejercicio de valorización de daños tiene cierto grado de especulación y elementos subjetivos como la discreción y el sentido de justicia y conciencia humana del juzgador de los

hechos. *Santiago Montañez v. Fresenius Medical,* 195 DPR 476, 490 (2016). Por lo tanto, los tribunales apelativos no intervendrán con la decisión que emitan los foros primarios a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. *Santiago Montañez v. Fresenius Medical,* supra, pág. 490; *Blás v. Hosp. Guadalupe, supra,* pág. 339. Las indemnizaciones en casos anteriores se toman como punto de partida y deben adaptarse al valor actual. *Herrera, Rivera v. SLG Ramírez-Vicens,* 179 DPR 774, 785 (2010). En *Rosado v. Supermercado Mr. Special,* 139 DPR 946, 954-955 (1998), la valorización de los daños que sufrió una de las partes fue estimada en la magnitud de los daños físicos que sufrió, molestias, dolores y condiciones que fueron desencadenadas a consecuencia de la caída. En el citado caso, el Tribunal Supremo no alteró la cuantía concedida por el TPI dado que fue el foro que evaluó el testimonio del perito y de las partes ante los daños sufridos por la parte que sufrió la caída. *Rosado v. Supermercado Mr. Special, supra,* pág. 955.

Por otro lado, el Estado goza de inmunidad soberana, es decir para ser demandado debe prestar su consentimiento. *Defendini Collazo v. ELA,* 134 DPR 28, 47 (1993). En esa línea, el Estado consintió a ser demandado en daños y perjuicios por actuaciones y omisiones culposas o negligentes de sus funcionarios, empleados o agentes, en el desempeño de sus funciones. *Defendini Collazo v. ELA, supra; Negrón Castro v. Soler Bernardini,* 2025 TSPR 96. Así pues, el Art. 2 de la *Ley de Reclamaciones y Demandas contra el Estado,* Ley Núm. 104 de 29 de junio de 1955 (Ley Núm. 104-1999), 32 LPRA sec. 3077) establece que,

> (a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000.00) dólares causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo

interviniendo culpa o negligencia; o acciones por daños y perjuicios por alegados actos de impericia médico hospitalaria a los profesionales de la salud que laboren en las áreas de obstetricia, ortopedia, cirugía general o trauma exclusivamente en instituciones de salud pública propiedad del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y/o municipios, independientemente de si dichas instituciones están administradas u operadas por una entidad privada; Cuando por tal acción u omisión se causaran daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de ciento cincuenta mil (150,000.00) dólares. Si de las conclusiones del Tribunal surgiera que la suma de los daños causados a cada una de las personas excede de ciento cincuenta mil (150,000.00) dólares, el Tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una acción contra el Estado por daños y perjuicios a la persona o a la propiedad, el Tribunal ordenará, mediante la publicación de edictos en un periódico de circulación general, que se notifique a todas las personas que pudieran tener interés común, que deberán comparecer ante el Tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas a los fines de proceder a distribuir la cantidad de ciento cincuenta mil (150,000.00) dólares entre los demandantes, según se provee en esta Ley.

Cuando el Estado tenga que responder por daños y perjuicios este solo será responsable hasta la suma de $75,000.00 o hasta la cantidad de $150,000.00 de existir varias causas de acción o varios perjudicados. *Negrón Castro v. Soler Bernardini, supra*, pág. 27. Dichos límites pueden ser aplicados a la porción de la deuda por la cual las partes sean responsables. *Negrón Castro v. Soler Bernardini, supra*.

### C.

Es sabido que los tribunales apelativos actúan como foros revisores. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Este Tribunal de Apelaciones tiene como tarea principal aplicar el derecho a los hechos particulares de cada caso. *Íd.* Dicha función, está cimentada en que el Tribunal de Primera Instancia haya desarrollado un expediente completo que incluya los hechos

que evaluó como ciertos ante la prueba que fue ventilada. *Íd.* Como Tribunal de Apelaciones, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos la credibilidad y, tampoco esbozamos determinaciones de hechos. *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011).

Sin embargo, las conclusiones de derecho son revisables en su totalidad por el Tribunal de Apelaciones. *Íd.* Ante ello, los foros revisores no intervendrán con las determinaciones de hechos coaligadas por el Tribunal de Primera Instancia, la apreciación sobre credibilidad y valor probatorio de la prueba presentada en sala. *Dávila Nieves v. Meléndez Marín, supra,* pág. 771; *Hernández Maldonado v. Taco Maker, supra,* pág. 289.

Como excepción, en caso de que la actuación del juzgador de los hechos medió pasión, prejuicio, parcialidad o error manifiesto, este Tribunal de Apelaciones puede descartar las determinaciones de los hechos. *Pueblo v. Millán Pacheco*, 182 DPR 595, 642 (2011) *Miranda Cruz y otros v. S.L.G. Ritch*, 176 D.P.R. 951 (2009); *Soc. de Gananciales v. Centro Gráfico*, 144 D.P.R. 952 (1998). El Tribunal Supremo ha resuelto que, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Álvarez v. Rivera*, 165 D.P.R. 1, 13 (2005); *Dávila Nieves v. Meléndez Marín, supra,* pág. 772, citando a: *Abudo Servera v. ATPR*, 105 DPR 728, 731 (1977). Ante una alegación de pasión, prejuicio o parcialidad, los foros apelativos debemos evaluar si el juez o la jueza cumplió su función judicial de adjudicar la controversia específica conforme a derecho y de manera imparcial, pues solo así podremos descansar con seguridad en sus determinaciones de hechos. *Dávila Nieves v. Meléndez Marín, supra,* pág. 777.

**III.**

En el caso de autos, el Estado argumentó que el TPI actuó contrario al Art. 404 del Código Político, *supra,* debido a que la vía pública carecía de tener una condición de peligrosidad o desperfecto previsible. Asimismo, alegó que la apelada asumió el riesgo de conducir un *scooter* sin protección y de noche. Consecuentemente, arguyó que el foro primario debió imponerle un porcentaje de responsabilidad mayor a la apelada.

Por estar relacionados los señalamientos de error, procederemos a discutirlos en conjunto.

Conforme las normas jurídicas pormenorizadas, para que prospere una causa de acción de responsabilidad civil extracontractual al amparo del Artículo 1536 del Código Civil, *supra,* se debe establecer: (1) la existencia de un daño real; (2) el nexo causal entre el daño y la acción u omisión del demandado, y (3) el acto u omisión cual tiene que ser culposo o negligente. *Cruz Flores et al. v. Hosp. Ryder et al.*, *supra*; *Pérez Hernández v. Lares Medical Center, Inc.*, *supra*, pág. 976; *López v. Porrata Doria, supra,* pág. 150. Con ello, el Estado debe responder en una acción de daños y perjuicios si la parte promovente prospera en demostrar que la acera tenía una condición de peligrosidad y no fue restaurada, entonces el Estado tiene la obligación de responder.

Por otro lado, una defensa que puede interponer una parte es la negligencia comparada. Dicha defensa dispone que, se le debe reducir el porcentaje de responsabilidad al causante del daño ante el grado de negligencia en que haya incurrido el promovente. Es decir, es una defensa en la que se promueve no imponerle la culpa absoluta al demandado. Ante ello, se debe individualizar el porcentaje de los daños entre las partes.

Luego de un análisis sosegado del expediente el *foro a quo* no incurrió en error en su dictamen.

Es preciso destacar que, esta Curia examinó las determinaciones de hechos coaligadas por el TPI y resolvemos que la actuación del juzgador en el foro primario no medió pasión, prejuicio, parcialidad o error manifiesto, por lo que, determinamos que las determinaciones de hechos fueron fundamentadas en la prueba desfilada ante su consideración.

Surge de la prueba oral que, el día de los hechos que dieron lugar a la controversia ante nos, la apelada y un grupo de personas conducían una *scooter* que rentaron en el Paseo de la Princesa.[13] Luego, en dirección al Viejo San Juan, mientras la apelada y sus acompañantes conducían en los *scooters*, en el ciclovía ubicado frente al Capitolio, se encontraba un tubo en el suelo, el cual la señora Claudio Mestre no lo vio y sufrió una caída en la *scooter* que conducía a consecuencia de tropezar con dicho tubo.[14] Se desprende de los testimonios que, el tubo con el que la apelada tropezó, es conocido como un delineador el cual canaliza el tránsito para dividir el ciclovía y la carreta en la que transitan los vehículos de motor.[15] Un perito añadió que, el tubo reflector debió estar colocado en una base que se encuentra ubicada en la carretera.[16] Con ello, tras la apelada tropezar con el delineador, esta quedó inconsciente y fue trasladada al hospital.[17] Ante la caída la señora Mestre Claudio sufrió varios percances en su salud, entre ellos aprender a desarrollar sus destrezas motoras.[18]

Durante el juicio surgió que la apelada y sus acompañantes nunca habían conducido un *scooter* y no utilizaron un casco.[19] No obstante, la apelada admitió que leyó rápidamente los términos y

---

[13] Transcripción de la Prueba Oral (TPO) celebrada el 2 de abril de 2025, pág. 14; líneas 1-5.
[14] TPO celebrada el 2 de abril de 2025, pág. 18; líneas 14-17.
[15] TPO de la vista celebrada el 3 de abril de 2025, pág. 13; líneas 9-13; pág. 20; líneas 9-14.
[16] TPO de la vista celebrada el 2 de abril de 2025, pág. 26; líneas 13-16.
[17] *Íd.*, pág. 29; líneas 9-12.
[18] *Íd.*, pág. 66; líneas 22-24.
[19] *Íd.*, pág. 47; líneas 4-9.

condiciones para conducir dicho *scooter*.[20] Asimismo, sostuvo que no vio cascos en el área de San Juan para ser utilizados al guiar un *scooter*.[21]

Por otro lado, el perito de la apelada testificó que, a consecuencia de la caída, la señora Claudio Mestre sufrió un daño en el hueso temporal del cráneo que se asocia con el equilibrio y balance y sangre en el cerebro y oído.[22] Ahora bien, un ingeniero del Estado testificó que, la ciclovía y la carretera está bajo la jurisdicción del DTOP.[23] Además, indicó que, una vez un delineador se encuentra en el suelo, y el DTOP adviene en conocimiento, este debe ser reemplazado por la agencia para evitar contratiempos.[24]

Ciertamente, concurrimos con la determinación del foro primario puesto que se configuraron los requisitos jurisprudenciales para que prosperara una acción sobre daños y perjuicios en contra del Estado. Destacamos que, en el presente recurso la parte apelante tiene el dominio de la acera en donde ocurrió la caída de la señora Claudio Mestre por lo que el Municipio no tiene el deber de responder en este caso. Según la prueba ante nos, en horas de la noche, la señora Claudio Mestre iba conduciendo un *scooter*, junto a unos acompañantes y, justamente cuando condujo frente al Capitolio se tropezó con un delineador que estaba sobre la ciclovía. Es decir, el delineador no estaba colocado parado en su respectiva base. A raíz de ello, la apelada sufrió varios percances de salud como resultado de la caída que sufrió tras tropezar con el *scooter*. Tal como apunta la señora Claudio Mestre, su accidente fue a causa de la dejadez del DTOP en no colocar el delineador en su base. Según el expediente ante nos, se desprende que el Estado debió haber tenido conocimiento, previo al accidente de la apelada, sobre la

---

[20] *Íd.*, pág. 72; líneas 3-13.
[21] *Íd.*, pág. 72; líneas 17-20.
[22] *Íd.*, pág. 96; líneas 17-22.
[23] TPO de la vista celebrada el 3 de abril de 2025, pág. 21; líneas 1-5.
[24] *Íd.*, pág. 22; líneas 20-23; pág. 23; líneas 1-3.

condición de peligrosidad que tenía la acera.[25] Ante ello, el Estado debió haber atendido con mayor premura el colocar el delineador en la base, no hubiese ocurrido el accidente de la apelada. Indiscutiblemente, el Estado debió corregir el delineador dado que podía prever que ocurriría un percance tal como ocurrió con la apelada. Además, conforme lo establecido en el Código Político, *supra*, el Estado tiene el deber de atender el desperfecto que tenía una carretera estatal y, por tanto, tiene el deber ineludible de mantener en buen estado las aceras y carreteras que ostentan bajo su jurisdicción.

Establecido lo anterior, coincidimos con el criterio del foro primario en cuanto a que procede la defensa de negligencia comparada. Ello, en virtud de que la apelada no empleó el uso de un casco, condujo un *scooter* de noche y no ejerció el debido cuidado.[26] Así pues, la apelante asumió un riesgo. A esos fines, el TPI actuó correctamente en imputarle un cincuenta (50) por ciento de responsabilidad a la apelada tras asumir un riesgo de conducir un *scooter* sin las debidas precauciones.

Empero, esta Curia no intervendrá con la cuantía concedida por el foro primario dado que le concederemos la deferencia que amerita y consideramos que es proporcional a los daños sufridos por la apelada. A los fines de resolver este caso, acudimos a la jurisprudencia para evaluar como el foro primario ha valorado los daños con respecto a una persona que sufre una caída. Conforme surge de *Rosado v. Supermercado Mr. Special*, *supra*, pág. 955, el TPI fundamentó la valorización de los daños en la magnitud de los daños que sufrió el agraviado y del testimonio pericial.[27] Es evidente que, en este caso, la apelada sufrió graves daños a consecuencia de la

---

[25] *Véase Sentencia*, Determinación de Hecho Núm. 25.
[26] *Véase Sentencia*, pág. 12.
[27] Véase, *Rivera. Tiendas Pitusa*, 148 DPR 695, 700 (1999); *Soc. de Gananciales v. FW Woolworth & Co.*, 143 DPR 76, 83 (1997).

caída, entre ellos, nuevamente desarrollar sus habilidades motoras, hospitalización y sangrado en el cerebro. Pese a que se le imputa un cincuenta (50) por ciento de responsabilidad a la apelada, ante el impacto y los efectos que sufrió la señora Claudio Mestre no intervendremos con la cuantía concedida por el foro primario.

Enfatizamos que, el porcentaje de responsabilidad que se le imponga al Estado no es el equivalente a la cuantía que la parte apelante le pueda conceder a una parte. El Estado tiene inmunidad soberana y, por tanto, estatuariamente hay un límite en cuanto a la cuantía que el Estado le puede conceder a una persona que prospera en una acción de daños y perjuicios en contra del Estado. Así pues, el cincuenta (50) por ciento que le imputó el TPI a la parte apelante no afecta el tope de la cuantía que el Estado puede proporcionar en concepto de daños y perjuicios. Es menester señalar que, el *foro a quo* le ordenó a la parte apelante a pagar el monto de $50,000.00 en aras de indemnizar a la apelada por los daños sufridos, la cual no excede el límite en que el Estado puede responder.

A la luz de los fundamentos esbozados, procederemos a confirmar el dictamen apelado debido a que el Estado incurrió en negligencia tras no reparar el delineador para que este no estuviera obstruyendo la ciclovía. De igual forma, la señora Claudio Mestre fue negligente tras no actuar de forma prudente y no prever los daños que sufrió.

**IV.**

Por los fundamentos que anteceden, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones